The third case of the morning is Academy of Allergy and Asthma in Primary Care, etc., against insurance companies including Louisiana Health Service and Indemnity Blue Cross. It's number 2330925. I'll hear first from Mr. Clement. Thank you, Your Honors. And may it please the Court, I'm going to endeavor to save five minutes for rebuttal. United Allergy offered an innovative service that promised relief for allergy sufferers but also promised a substantial uptick in claims that health insurers would need to pay. Rather than respond to the influx of claims independently, the defendants compared notes, pooled resources, and partnered to shut UAS down. The District Court entered summary judgment nevertheless on the sole ground that there was no evidence from which a jury could find that the joint boycott of UAS was a product of an agreement rather than independent decision making. That decision is bewildering as this is not a case where the plaintiff seeks to go to the jury based solely on evidence of parallel conduct. To the contrary, there is ample direct and circumstantial evidence of a common understanding among the defendants who are communicating and coordinating efforts to deny UAS claims and respond to inquiring regulators. Indeed, conspirators shared privileged legal advice and talked about, quote, pooling resources and, quote, partnering to, quote, shut down UAS, end quote. While one might think that this unusual candor stemmed from a sense that joint efforts to target fraud were permissible, when asked in deposition, defendants' witnesses uniformly conceded that the practices at issue were not fraudulent, no government investigation has ever found fraud, and Medicare and Medicaid have paid for these services throughout the entire period, including to this very day. What is more, the evidence here makes clear that the defendant's intent was not to target fraud but to shut UAS down. The internal communications revealed in discovery did not talk about we have to shut UAS's fraud down. No, we had to shut UAS itself down. In short, the one thing that seems clear from this record is that the joint boycott and successful elimination of UAS from the Kansas and Louisiana markets was not the result of merely parallel individual decision-making. The district court's contrary conclusion appears to be driven by the view that the ordinary summary judgment rules do not apply in Section 1 cases when it comes to the existence of an agreement. But while it is certainly true that mere evidence of parallel conduct is not enough to get to the jury, the ultimate question is whether there is a genuine issue of whether the joint activity was collusive or independent. Evidence of parallel conduct that does not exclude the possibility of independent conduct does not move the needle, but when you have documents, internal documents, that say that they were comparing notes, that they were pooling resources, that they were partnering each other, that is plainly evidence that tends to exclude the possibility of independent action-making. And I think the fundamental problem here is that, you know, the district court judge for direct evidence was looking for the magic words of references to an agreement. And I don't think that's the proper standard. I think what you're . . . Well, wasn't the district judge following a series of Fifth Circuit opinions, one of them being Tunica Webb Advertising that says, citing Matsushita, circumstantial evidence of a conspiracy must be strong in order to survive summary judgment because antitrust law limits the range of permissible inferences from ambiguous evidence. There's no question, Judge Jones, the district court cited that decision. We do think the district court overread that decision. We also think we have strong evidence here. There's also the Golden Bridge decision from this court, 2008, which rejected a . . . similar . . . coordinating technological standards for wireless communications, and they decided to not to eliminate one of the forms of whatever it was that was being supplied, and they agreed to eliminate it, and they got sued. And the court here points out, citing Matsushita and so on, that the fact that they disliked this entity does not mean they were boycotting it or conspiring to boycott it. Absolutely, Your Honor. And that was coordinated activity. Sure. But, you know, I actually think Golden Bridge . . . I mean, first of all, I think obviously Golden Bridge comes out one way in terms of the summary judgment standard, Tunica comes out the other way and says that there was enough evidence in that record for . . . to get past the summary judgment stage. So I think you're going to have to evaluate all these cases on their own fours. But I actually think Golden Bridge points out something helpful, which is obviously when you're talking about allegations of misconduct in a standard setting context, that is the kind of claim that I think judges should be inherently skeptical about. And I think if you go back to Matsushita, that's a predatory pricing claim, and most of the evidence was prices went down. Not only is that not surprising, that's not bad. And I think when you translate those same principles into something like a joint boycott that doesn't arise in a standard setting context, some of that skepticism is a little bit misplaced. And I think in particular, you know, I think it's a helpful exercise to think if this were not a joint boycott case, but a price-fixing case, and you had evidence that pointed out that, you know, how are we going to increase our revenues? And then one of the things in a document in the file... Let me just add that BCBS Louisiana did not boycott this service. What it said was we're limiting reimbursements to X units per 60 days. That's what they did from September 2013 to January 2014. But then in January 2014, they barred all claims on the grounds of medical necessity after essentially pre-cooking that judgment with AllMed. And so I think it hurts them on both ends of that, because in the first period, from September 2013 to January 1st, 2014, they are doing, to quote one of their own witnesses, let's do what Blue Cross Texas is doing. And they do the exact same thing for those 30 days. Or they may come up here and say, well, it was 75 versus 60. So why didn't you sue Blue Cross Texas? Well, there's a good reason for that, Your Honor, which is we threatened to sue Blue Cross Texas. We, you know, alleged that they were doing wrong things. And then as the evidence here shows, their lawyers wimped out and they agreed to pay our claims. What they did is the original claims were for 300 units, and then they reduced that to 60. And that's something we could live with. And that's why we're still in business in Texas, and we're not in business today in Louisiana and Kansas. And if they had all agreed to 60 units, that would still be an antitrust violation. But we very well might not be here, because it wouldn't have forced us essentially out of the market entirely. But they weren't ultimately persuaded that 60 units was enough. Their own witness said, we've got to stop the bleeding. And so they barred the claims altogether starting in January of 2014. Now, again, I find the district court's judgment here that there was no agreement somewhat bewildering, because of the sort of cover of agreements to discuss waste, fraud, and abuse. This seems like a classic case where, yeah, there's an agreement. There's not independent conduct. I don't think they can plausibly claim that they came upon all these conclusions completely independently. They were clearly talking to each other. Identities were at this meeting in Texas where this all apparently started. So there's a couple of meetings in Texas. There's a presentation that Texas makes at the Blue Cross Association that a number of people attended. I don't know the exact number, but it's not just Blue Cross of Kansas, it's a number of the Blues. And then there's the subsequent meeting, which is just between the Blue Cross Louisiana and Blue Cross Texas. And that's the meeting that is immediately followed by the email and the record from Dr. Brower, this is a record of appeal 23-429. And that's the one that talks about pooling resources. It also reports that the Blue Cross Texas lawyers had wimped out. And then it also reports that Humana has had the gumption to stop these claims entirely. So, and I think every aspect of that is strong circumstantial evidence at a minimum, if not direct evidence. I think the reference to pooling is direct evidence, but in all events, it's strong circumstantial evidence. I mean, pool, you are taking that out of context. As I see that quotation, it says, Texas has no problem with whatever decision we make in the meantime. But wanted to pool our resources on the federal prosecution route, and whatever association fraud strike force efforts come about. So since no other efforts of prosecution, there was a brief apparently inquiry, but no, pooling resources is about if there was fraud. Well, aren't insurers allowed to look at novel things to see whether there might be fraud involved? I mean, this is a very strange arrangement as far as I'm concerned, medically. So, Judge Jones, I think that is an argument that they could make to the jury. Footnote 11 of Monsanto specifically says that if you have a document and there are different inferences you could draw from the document, that is a judgment for the jury. Yes, but now you're relying on magic words using pool our resources out of context from a legitimate explanation for what they might be doing. I don't think it's a legitimate explanation, with all due respect, Your Honor, and we tried not to pull that out of context. I mean, the way we would have pulled it out of context is if we would have taken out the reference to going to the government, which was Norr Pennington protected. But we were careful to give that full context. But the problem that my friends on the other side have is, as the 11th Circuit has made clear, association strike forces are not the same thing as talking to the government. And the association does not have any antitrust immunity. And when they talk about their pooling their resources in this association strike force, and then follow it up with the other evidence that supports the idea that this was not just an effort to fight fraud. And I think this is where, if you go to page 53 of our opening brief, the blue brief, we sort of collect the deposition testimony where their own people were asked, did you actually think this practice was fraud, and they say no. And again, if you look at the documents, I mean the Highmark document, admittedly Highmark's not a defendant, but I don't think there's any rule that says that evidence has to come from a defendant. The Highmark document does not say, should we pool our resources to fight fraud? No, it says partnering with the blue plans to shut down UAS. And I think throughout all of this, and one thing I want to emphasize is there are decisions of this case that say information sharing is not enough. But in that regard, not all information is created equal. And I think one thing that is- And why did you not sue Highmark? So a couple of things there, Your Honor. One, well, I just want to be directly responsive. One is, at the point that we filed the complaints, we didn't have the benefit of the discovery. And the second thing is that Highmark, after a period of blocking all refusal to deal, then adopted the kind of 60 approach that Texas did. So we're not looking to sue people that allow us to do business in their states and allow our business model to go forward. We are, but- I mean, just let me pause it to you. I can't think, and maybe I'm just ignorant, but I've been around the bend with medical stuff for a while, just because of my age. But I don't know anybody who prescribes prescription medications for a year in advance and tells the patient, we're sending you home with a year's worth of medication. And that would alert any reasonable consumer to say, is this going to be safe for me for a whole year, I never have to come back to the doctor. This tech who prescribed it to me has no medical training whatsoever. I don't know an allergist because after all, they're on it. I mean, it's a very unusual arrangement. And I think that's why it got flagged by some of these people. But that's why the reasonable solution that Texas reached and other jurisdictions reached is, all right, maybe we don't like the 300 at a time deal, but let's go down to 60, we'll pay that. And- Are there any lawsuits by patients over non-coverage in Louisiana or Kansas? I don't know that there were suits, Your Honor, but there were certainly complaints in the record. We point to some of that in our briefs. And look, part of the problem with the healthcare industry is, it's awfully hard as an allergy sufferer to know who to complain to. And you get the flavor of this from the other side's briefs. They're like, look, we don't really respond to patient complaints. And it's the employer's decision. But is your employer going to change healthcare plans just because you don't get the coverage you want? Probably not. I'm sorry, Judge Hendricks. Okay, go ahead. So I think this is a situation where you have an agreement among people. And maybe, again, they'll be able to argue to the jury that this was all a legitimate effort to target fraud. I think they're going to have problems arguing that to the jury when their own deposition testimony says that they didn't actually think this was a fraudulent practice. I think they're going to have difficulties when they're confronted with the evidence. And this is the point I was making just a minute ago. Information sharing is one thing. At the beginning of this and the end of this, in the Brower email and in the discussions between Humana and Blue Cross Louisiana, once the regulators start asking questions. They are sharing their lawyer's advice. And the lawyer's advice is not lawyer's advice about fraud. It's the lawyer's advice about, well, we tried to stop paying, but our lawyers wimped out. And then on the back end, you have Blue Cross of Louisiana telling Humana, we tried this idea that this wasn't directly being provided by the physician, and that would be the reason that we would deny payment, but our lawyers told us we couldn't do that, so we've been denying a medical necessity. And then in 2015, Humana starts denying a medical necessity. So I think they're going to have problems making the pitch to the jury that this was all a legitimate effort to fight fraud. But it should be an issue for the jury. Thank you, Your Honor. Chance for rebuttal. Okay, Ms. LaLue. Good morning, Your Honors, and may it please the court, Sherry LaLue on behalf of Humana. The evidence in this case is anything but startling or suspicious. All we have here are the fraud investigators of each health plan, carrying out their everyday responsibility of detecting potential fraud, waste, and abuse. And let's not forget, waste and abuse are important parts of that mandate. And also ensuring that their members are getting safe, effective, and necessary treatments. Ms. LaLue, if the SIU coordinators for each of the plans looked at this and said, gosh, 300 units is a lot. Why don't we all get together and we'll do 60 units? And there was an agreement in email where they all said 60 units, right? And this is the very beginning of the case. So I realize Humana started this in 2010, so let's use 2010 or 12, somewhere before 2013. They all get together, they say let's do 60, the next day they all do 60, and that's that. Section one violation or no? Yes or no? I would argue that possibly not. How could that possibly not be a section one violation? That's an extraordinary assertion. I thought, Judge Oldham, that you might say that. And the reason is that what competitive effect? There would be pro-competitive reasons to ensure that patients are getting necessary services, that the healthcare system is not being bilked of the tens of billions of dollars that it does suffer right now. What would be the circumstance? And they're, pardon me, sorry, just to finish the thought. It's hard for me to imagine what anti-competitive effect, what substantial anti-competitive effect that would have. Remember, UAS, they're not even a healthcare provider. They're a technician services. 60 days means is that you have to go back to the doctor, right? Pardon me? All that 60 days would mean is you have to go back and get it reauthorized, right? You're not being limited to 60 days worth of, right? If I'm understanding your Honor's question, yes. If they limit the units, they would go back. It's not a boycott at all. It's a condition on the reimbursement. Right. And I also would say, like, this is an antitrust conspiracy case under Section 1, right? This isn't a referendum of whether this business model is helpful to patients or not. And what they have to have, as Judge Jones was pointing out, under well-established Supreme Court and this Court's case law, is evidence that tends to exclude the possibility of independent conduct. The conduct here has to be not just consistent with conspiracy, but absolutely inconsistent with each company making a rational business decision on its own. Well, you just told me that even when you have absolute diehard, imagine a contract, a memorandum of understanding amongst all of the health providers in the United States, and it says we're only going to do 60, and they all sign it. So there's no disagreement that that's concerted joint action, and it's all an agreement as to price, in a sense. But even that may not be sufficient, because it could have pro-competitive effects, is what I heard you say earlier. And I would take issue that it would even have an effect on price, to be honest with you. But I think it would, antitrust cases are complicated, right? And unless you have a straight up, horizontal price fixing case, they get very complicated. And that is an issue where you would have to examine the market and the market effects and exactly what's happening. And if you're buying insulin, you can't get insulin prescribed into the indefinite future. And that's life saving. So that's what you're- I mean, there's nothing that is unreasonable from an economic standpoint about saying that a maximum of 60 days. Or I'm not opining about the agreement otherwise. I'm just talking about Judge Oldham's hypothetical. Yeah, Judge Jones, I think you're pointing out a good point, which has to be taken into consideration. Under this Matsushita, which flows from Monsanto, which has been applied in many cases of this court, including Judge Jones in your Abraham and Veniklason case, context matters. And we have to remember, this was a very new, unusual business model that raised legitimate concerns, not just among the payers, but among government entities. UAS was investigated. It's irrelevant that they were never prosecuted. It's irrelevant that there was no fraud claim brought, or even if the health insurers independently determined it wasn't fraud. That doesn't mean it did not raise legitimate concerns and that they could not engage in the kind of information sharing that they engage in all the time. These folks who were involved in the communications, they're not competitive decision makers. This isn't, they're not sharing information about competitively sensitive things. I agree with my learning colleague on the other side. Not all information is the same. This isn't price information. This isn't forward-looking plan design. This isn't reimbursement rates. This isn't anything that the insurance companies actually compete on. In fact, the record said, this isn't about coverage of allergy services, to be clear. And the record says that even coverage of allergy services isn't something that you would compete on. And Humana- Can you at least give me this? That the providers could not get together and make a joint agreement to exclude UAS from the market? To just, in a document entitled, I'm just trying to find some common ground so that we can then reason back to how this case is different. But if I can't get that literally agreeing on price isn't a section one violation, what if it was a document that said, memorandum of understanding regarding group boycott of UAS. And then they all signed it and said, we want to shut down UAS because we're bleeding money. And we have to get our money back. And then we all signed it. Is that a section one violation? It likely would be. And to be clear, Judge Oldham, I wasn't suggesting that an agreement on price would not be a section one violation. I just questioned whether the agreement you were hypothesizing actually would be- Do you think there's a meaningful difference between an agreement on price and an agreement on quantity? The Supreme Court said no. ARRETA says no. But this isn't- There's not a disagreement on quantity. No, I'm asking if we had a joint horizontal agreement on quantity, do you think that that would be a section one violation? Again, it depends on the exact facts of what the quantity is and what the rationale were. And then whether it would be under rule of reason. And then you would evaluate the potential pro-competitive. But that's not obviously what we have here. And in fact, it's undisputed that Humana made its decision in 2010 by itself. It saw the claim spike. It did its investigation. Does the record tell us whether it's typical for fraud investigators, health providers, for the result of any of those meetings to be something other than referring it to law enforcement and making instead a decision on quantity of approved vials or quantity of medication? I understand your argument to focus on anti-fraud communications and that's required by law. Does the record tell us whether this is a typical result? A typical result- Of a fraud investigators getting together. I can understand them saying, yes, we think this is fraud. Take a more extreme example where providers are billing for services not actually rendered. Just straight fraud. To follow up on Judge Oldham's question, does the record tell us whether it is typical for fraud investigators to have a say in not stopping payments but limiting payments to 60 vials in this case initially? Is that within the purview of a fraud investigator's role? So, I believe what the record reflects is the fraud investigators conduct the investigation and provide that information to other decision makers who can decide what each plan is going to do. To the extent, Judge Hendricks, you're asking about sharing information. Yes, the record is replete with that. There are public partner organizations in which this kind of information about potential schemes is shared routinely and that's- Yeah, I understand that. What I had hoped to ask and tried to ask Mr. Clement, I'll ask you, help me with a limiting principle for your position. Health insurers can share, they have an obligation to share fraud information in their investigations in law enforcement. I know your position is that they can also share it with other providers, correct? Right. Take my extreme example again. Just billing for fraud, billing for services not rendered. And a provider operates in all 50 states. One health insurance provider discovers that. They share it with providers across all 50 states. Presumably, if it's a legit and thorough investigation, they will also stop paying those claims. They will follow suit. They will have concerted parallel action and that person will be driven from the market. What is the limitation of your position? When does it cross the line into anti-competitive conduct? Well, it's not my position, Your Honor. It's the Supreme Court and this Court's holdings that say, you need something more than even a communication and parallel conduct. You need actions that are against the independent self-interest of the parties at issue. Well, Monsanto defines concerted action as something that's designed to achieve an unlawful objective. So in my extreme example, it's obviously not designed to achieve an unlawful objective. When would it be? Well, if, for instance, you know, picking up on Judge Oldham's scenario, if they all got together and said, you know what, we don't like this provider. It's going to drive up our costs. Let's all get together and we're going to boycott the provider. Then I think then you're in an unlawful purpose. You're crossing the line in a way, particularly if that affected them competitively and they couldn't do it by themselves. Here we have Humana denying the claims for years while other providers are paying them. They didn't sue Texas, not because Texas wasn't involved in a conspiracy. They didn't sue Texas because they got Texas to capitulate to their will. And this is a classic example. Pardon me. I see my time is up. But this is a classic example of a failed business model coming to the court under the rubric of the Sherman Act. And with that, I will yield to my colleagues. Thank you. Okay. Thank you, Mr. Drew. Thank you, Your Honors. Michael Drew on behalf of Blue Cross Louisiana and ALMED. And we certainly adopt all of Ms. Lalu's points and arguments as well as those of our colleague, Mr. Cardozo. I wanted to touch on two points that we raised in our briefs. The first is that there is a threshold question here that Judge Barbier did not get to, but this court should consider, which is the question of whether either UAS or AAAPC have demonstrated appropriate standing. And it's important for the court to consider that threshold question as you did, Judge Jones, in the Jebico opinion. Because absent standing, none of this gets to the question of is there a Section 1 conspiracy? And in this case, neither UAS nor AAAPC have demonstrated that they satisfy the test for antitrust standing. In the case of UAS, they are a classically too remote party to bring these antitrust claims, something Judge Barbier recognized when asking the question of why aren't the providers, why aren't the patients, Judge Jones, as you noted, why haven't any of these patients who are allegedly being denied this allergy testing and immunotherapy, why haven't they brought suit? And as this court found in McCormick, there's the central question of was there someone more directly harmed? And when you look at the UAS business model, UAS contracts with providers. They are a supplier. They supply technicians. They supply the reagents, the immunotherapy sera. They do not treat patients. They do not see patients. They do not submit claims to any of the insurer defendants in this case. And they are not reimbursed by any of the insurer defendants in this case. So their theory of harm only comes about if a patient sees their primary care physician, the claim is submitted, the claim is denied, and the primary care physician at some point says, I'm not going to collect from my patient and I'm tired of paying these guys for a service that I'm not getting reimbursed for. The more appropriate plaintiff, to the extent there is an appropriate plaintiff, and as you heard Ms. Lalu say, there's no antitrust issue here, so there isn't an appropriate plaintiff, but to the extent there is one, it would be the physicians or the patients themselves. And that brings me to AAAPC, which, according to the plaintiffs, is an association of these primary care physicians that want to provide allergy testing and immunotherapy. And the record demonstrates that they don't need UAS to do that. In fact, the corporate representative for AAAPC testified, and this is his deposition transcript is at the record at 1370, and also summarized at, I'm sorry, 13070, and also summarized at 13051 to 52, he testified that he, on independent research, began providing allergy testing and immunotherapy to his patients without UAS. Similarly, their expert economist said that the UAS method was not necessary for a primary care physician to be able to provide the exact same services. So in the case of AAAPC, there's no demonstration that their members were restricted in providing these services within the allergy testing and immunotherapy market. Likewise, AAAPC was not able to offer any evidence that any of its members actually canceled contracts with UAS or had claims denied by any of the insurer defendants. And that's in the record at 13063. So if you have an association whose members suffer no injury and who can't even identify a member who was harmed by the conduct alleged, that association can't maintain standing. So neither UAS nor AAAPC have demonstrated standing. And I see, Your Honors, with my last minute, my last breath, if you will, I would like to shift focus for one second to AllMed. You've heard a lot about the role of the insurers in this, but other than Mr. Clement's comment that Louisiana tried to precook the judgment with AllMed, you've heard very little about them. And there's a reason why you've heard very little about them. They just don't fit. They were an independent review organization who had been in contract with Blue Cross Louisiana since 2009. And this is in the record at page 13771. It's in the deposition of Dr. Brower. And he, in investigating this novel protocol, had developed his view that the protocol was not medically necessary, but he wanted someone who was not only with the healthcare, the medical necessity aspect of it, but who was also familiar with interpreting those terms against the language of insurance policies. So he reached out to an independent review organization and said, will you have an allergist look at this? It was one allergist who reviewed it. And then subsequently, other allergists would independently review appeals of these claims. Counselor, your time was short, so I didn't want to interrupt you with it, but I just want to make sure I get your answer. Why was the district court wrong to rely on associated general contractors in rejecting the antitrust standing? How is UAS any different than the unionized firms in that case? So, Your Honor, I think there's two things, and I'll conclude with this. First, that was at the pleading stage. That was on a reconsideration of a Rule 12 motion. What we're now at is an evidentiary point, summary judgment. And they pled that the insurers coerced providers to stop doing business with them. At summary judgment, they offered no proof of that. And then secondly, Your Honor, I would suggest they're not in the same position as the contractors in that case. They would be much more similar to the parties in the New England contractor's case from 2003, where they were a downstream supplier to, or in that case, a downstream purchaser of, a service from an upstream party. And in that case, the contractors sued the building material suppliers, but there was an intermediary there, a distributor, that if there was a price-fixing conspiracy, it would be more directly felt by the distributor. And that's the situation with UAS. Any harm from this would be more directly felt by either the patients or the providers themselves, not their supplier. Unless the Court has any further questions, thank you for the time. Okay, thank you. All right. Mr. Cardozo. Thank you, Judge Jones. May I please the Court, Ray Cardozo for Blue Cross Blue Shield of Kansas. I'd like to start with Judge Jones' comments on the Golden Bridge case, because I think they feed into the answer to the questions you raised, Judge Hendricks, and the points you raised, Judge Oldham. What Golden Gate said about why mere evidence of exchanges of information and parallel conduct is insufficient to raise a tribal issue of fact, to get by summary judgment, was because each of the players had their own independent interests in doing what they did. And therefore, all of the evidence was at the most consistent with permissible competition, as well as the unlawful conspiracy. And that's why it didn't suffice. So, Judge Hendricks, the record does show not only that there's exchanges among SIU investigators, but you have to put it in the context of, as Judge Jones put it, this was a very strange arrangement, an unusual arrangement. So, when you've seen something you have never seen before, it's very natural to ask your counterpart, what are you doing? Opposing counsel points out that there's deposition testimony in his view that witnesses admitted that there was no fraud here. Is that a fair and complete and comprehensive summary of that deposition testimony? Because if it were the case, I mean, the argument is they're not really talking about fraud because they admit there was no fraud. Well, I'd qualify it in two ways. Remember, it's not just fraud, but you have an obligation to apply the contractual terms for all the members. That's how these health plans work. The members lose if the plan, whose job it is to apply those terms, isn't carefully applying them. So, to take Kansas, for example, its ultimate decision was you did not meet the eligible provider definition under our contract. It based that decision on its own contract. It had no communication whatsoever, zero in this record, with Humana, Louisiana. When it made that decision after a nine-month independent investigation. Was that a function of the Waste, Fraud, and Abuse people or? The Waste, Fraud, and Abuse team does not. That's the other important point that was gone entirely unaddressed. The Waste, Fraud, and Abuse team doesn't make these decisions. They don't make claims decisions. That's undisputed in the record. They investigate. They file a report that goes to the business. The business made the decision that it's not an eligible provider. So, all we have in this case are people who do collaborate on Waste, Fraud, and Abuse. Talking, what are you doing? What are you doing about this thing we've never seen before? But the timing, your question Judge Ault, what's missing in this case is that agreement. The district court, the nub of it, the district court had sort of a bottom line point at page 16 of its order, record 25.826. None of the insurance companies recommended that any other company follow a specific policy and none of the evidence shows defendants referencing an effort to align the company's policies with each other. Can I ask you a question? Is there a way to have a group boycott where people, the members of the boycott, agree to the end but pursue different means to do it? They could, but what's missing is that initial agreement. So, when you have... But the fact, I just want to parse it to make sure that we're on the same page. So, it doesn't matter that some people say pass through, some people say medical necessity, some people say Waste, Fraud, and Abuse, some people say some other reason. If the point of the boycott is to exclude the provider, the company in this case, that is sufficient regardless of the fact that the means are different. You're just disagreeing on the front end that there was no agreement to do the group boycott. Right, but I also say, I wouldn't say it doesn't matter. I say the fact that they're doing it all different ways is also an indication that there isn't an agreement because as the district court pointed out, you have to look at the context and the timing. They all made their decisions at different times. There's an undisputed record of feats of paper, reviewing records, conducting their own investigation. And so, when you have that and the decision comes out different, when Kansas bases on the terms of its plan, when Humana does it on a different ground, and Louisiana does it in a different town, they do it at different times. And the so-called conspiratorial conduct, the outreach from Louisiana to Kansas, happens months after Kansas has already made its decision. Let me ask you. So, sorry, go ahead. Is there evidence that any of these defendants knew that other companies were approving payments? Knew they were approving? Knew that they were approving payments. In other words, you know, so you're just attributing to three companies out of 50 or 60 or 70 the possibility of not making payments to UAS. I actually don't think there's any evidence, at least as to Kansas. The only thing the record shows is Kansas knew Texas had done some kind of investigation. I mean, Blue Cross is not the only insurance carrier in Kansas. It's not. And it's certainly not the only one who contracts with Medicare or has statutory obligations against waste, fraud, or abuse, or whatever. So, it's not talking to anybody else to kick them out of Kansas, right? Well, there are many reasons why this conspiracy is not just implausible, but very far-fetched. There's no communication at all between Kansas and its two biggest competitors, UnitedHealthcare and Aetna, which it turns out were paying the claims. Kansas didn't even know that. Kansas did not know what Humana was doing. There's no evidence Kansas knew what Humana was doing. There's no evidence Kansas knew what Louisiana's doing, its fellow conspirators. The contact, first contact, there's zero contact between Kansas and Humana. The first contact between Kansas and Louisiana is when UAS misrepresents that they're all paying. Louisiana then reaches out to Kansas. This happens. The record is undisputed. Months after Kansas has done a nine-month investigation on its own without contact with anyone, made its own decision. And Louisiana asks, what are you doing? That's not, not only is that not evidence of an agreement, it's the opposite. They have to ask the question. But to come back to your point, Judge Jones, Kansas doesn't even know whether others are approving. The only thing in this record it knew is that Texas was investigating. There's no, the two people it sued with here in the courtroom, Humana and Louisiana, zero contact with Humana in this record, zero and nothing with Louisiana. All right, thank you. Okay, Mr. Clement. We'll give you a couple extra minutes if you want. Thank you, Your Honors. I appreciate it. Let me start with the answer that surprised me as well, which was the answer to your first question, Judge Oldham. Because it seems like that would be an obvious situation where it would be an antitrust violation. But at a minimum, it seems beyond all doubt that that would be evidence of an agreement. And that is the only ground on which we lost summary judgment here. And I think my friend on the other side had some arguments that start to sound like some kind of argument for why the rule of reason should apply here rather than the per se rule to this particular joint boycott because of the context. That is not why we lost below. We lost below because there was no agreement, which is, again, as I said in my opening, bewildering because there's so much evidence of communications, of knowing what each other was doing. To answer your last question, Judge Jones, of course people knew that some people were paying. The communication between Blue Cross Texas and Blue Cross Louisiana said, we're paying 60 at a time because our lawyers wimped out. I mean, if you've got 100 competitors in a market and three of them make a decision that they don't want to deal with a particular supplier, where's the, I mean, is that a section one per se violation? I would say yes. And I think the Supreme Court would too. You're going to have a damn hard time proving any damages though, right? I don't think so. Especially not when you have healthcare insurers that are sort of defined territorial like the Blue Cross. I mean, we are, as a matter of fact. If you have Humana and United Healthcare, both of which I believe service the federal government, which is a major healthcare provider, agreeing to pay these claims. I just, I'm bewildered about the claim of anti-competitive conduct. Well, I guess we can all be bewildered by our own thing. I'm bewildered in a context where Medicaid and Medicare has continued to pay these payments that you can have this kind of refusal to deal. And I think, and again, the question at the end of the day though, is not, do you think there ought to be a little more play in the joints in this context? What's your best case? Because the standard deal about this is cartel activity. And cartel implies that you've got somebody that's trying to rig the market. Like OPEC, for instance. But the standard refutation of cartel activity is that some people won't play along. Which is to say, Venezuela or the United States that won't agree to the price fixing or whatever it is. This is not a cartelization of refusal to deal. I mean, that may or may not be true, but that's with all due respect, A, not a prerequisite for a joint boycott. What's your best case for a conspiracy that involves, I won't say insignificant, but single players in a multi-defendant market? So I don't have that case in front of me, Judge Jones, but that's because we didn't lose on that ground. We didn't lose on the ground that we didn't have sufficient market power. Well, the others can talk about hypotheticals, so can I. And that's what I'm having a hard time fitting into my standard understanding. So all I can say, Judge Jones, is it is black letter law that if there is a joint boycott between people that, or among people that don't even have market power, that is still a per se violation of the antitrust laws. And again, it's not why we lost. We lost because of the absence of the agreement. Now, if I could, just a couple of questions that are still out. What's typical in this industry? Well, the guidelines that their own association has when they meet to discuss fraud tell you what's typical, and it's not discussing particular providers, and it's not discussing 60 units versus 300 units. And as you said, Judge Hendricks, or at least implied, it's one thing to get together and compare notes and then report to government investigators. It's quite another thing to get together and share information about how you're going to shut down a particular provider. And that gets to the limiting principle that you asked for. I mean, first of all, the limiting principle, again, this isn't a question about where, like how we should do this. Should it be rule of reason? What are the limits on their ability to talk? We lost because there was no agreement here at all. And with the evidence of partnering and pooling and sharing attorney-client confidential information, it seems there is clearly evidence of an agreement here. But if you ask for a limiting principle, if these documents didn't talk about pooling, if they didn't talk about partnering, if they didn't talk about shutting down UAS, this would be a very different case. And my friends on the other side invoked the Golden Bridge case. But in Golden Bridge, if they had used the standard setting context to talk about shutting down the company completely, not just not including... Shut down, that's the point. In Golden Bridge, they did shut down that particular... No, they just didn't include the technology on the optional list of technology that would be in the standard setting context. Yeah, and they lost because there was no agreement. Right, exactly. But the evidence here is quite different. Again, if you put these facts on the standard setting, price fixing, whatever it is, and I'll go back to the high mark. If you have somebody that says, look, we got to increase our revenues. Should we partner with our competitors to increase revenues? And then there's an attached spreadsheet that shows what every one of their competitors' pricing patterns are. I mean, the concept that Blue Cross Blue Shield of Kansas doesn't know what their competitors are doing, with all due respect, I don't think that passes the straight face test. Let's assume they do know what their competitors are doing and their other competitors are deciding to pay. So from a competitive standpoint, if they're in the business of offering services for which they get paid premiums, then you would think they would want to offer more services as long as they are legit. I don't think many people have that experience with their health insurers, with all due respect. I don't care. We're not making jury arguments. I'm arguing economic principles. But let me ask you one other thing. That is, my understanding is that one of the areas of concern here was that this product was being offered to the patients to self-inject for a year. So they weren't being offered the product, try it for 30 days, see if you can stick yourself in the thigh or the arm on a regular basis. Because a lot of people are reluctant to do that. No, you're buying 300 units one year at a time for several thousand dollars, right? Right? Exactly. And there's two ways to respond to that, Judge Jones. You can respond to the way Texas did, and we didn't sue them because we're in that market. My point is that given the average patient and the average familiarity of the average person with this kind of regime, many of them are not gonna, any more than a diet plan that you have to buy for a year in advance, they are not gonna sign up to shoot themselves regularly for an entire year. That's what I'm saying raised legitimate concerns of the insurance. Why should we have to pay for a whole year when most patients, many patients, aren't gonna be able to inject themselves regularly for a year? Again, I mean, I said this before, but that is an argument for why an insurer might do what Texas did. And if these insurers had done what Texas did, there'd still be an agreement. I'd still have an antitrust claim, but I probably wouldn't be here because we'd be doing business just as we're doing business. They could have made a legitimate claim about medical necessity. I don't think they can with all due respect. But again, these are issues that- And if they could, would that be a boycott? If they could? No, I mean, put it this way. If they could, it might be a jury argument for why, notwithstanding there's an agreement and notwithstanding there's a joint boycott, we weren't actually doing something problematic. We were just, again, the jury can hear those arguments. I think the jury is gonna be skeptical of those arguments, especially when they see the evidence in the record, when they hear about pooling, when they hear about partnering, when they, again, if you want evidence of why, there's an incentive- We reversed a jury verdict in your favor within the last few months, right? Or was it- It was a bench trial, I think. But yeah, on behalf of a different client. Yes. No, I mean, look, judges make mistakes for sure. And we think the judge here made a mistake by saying that there wasn't enough evidence to get to the jury. And I know over my time, but I just would like to talk about one Freudian slip on one of my friends. They said in response to Judge Oldham's question that the evidence to support summary judgment has to be, quote, absolutely inconsistent with independent activity. And that's essentially the flavor of the district court opinion. And that is dead wrong. This court has said time and time again, it has to tend to exclude independent action. And when you have evidence of people agreeing and sharing their attorney client information, that tends to exclude reaching the conclusions independently. Thank you, your honors. All right. So thank you very much. That concludes the arguments of the morning. We're in recess till nine o'clock.